<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| CLINT WALKER DAVIS, JR., : | |
| : | |
| Plaintiff, : | |
| v. : | Civil Action No. 3:16-cv-01616-BRM-DEA |
| : | |
| ADMIRAL PAUL F. ZUKUNFT, : | |
| Commandant, United States Coast Guard, : | |
| : | **OPINION** |
| Defendant. : | |

**MARTINOTTI, DISTRICT JUDGE**

    Before this Court are Plaintiff Clint Walker Davis, Jr.'s ("Plaintiff" or "Davis") Motion for Summary Judgment (ECF No. 15) and Defendant Admiral Paul F. Zukunft, in his capacity as Commandant of the United States Coast Guard's ("Defendant" or "Coast Guard") Motion for Summary Judgment (ECF No. 13). Both parties move for summary judgment as to whether Davis is entitled to recover attorney's fees and expenses from the Coast Guard under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504. Both motions are opposed. Pursuant to Federal Rule of Civil Procedure 78(b), the Court did not hear oral argument. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is **GRANTED in part and REMANDED in part** and Defendant's Motion for Summary Judgment is **DENIED**.

**I. BACKGROUND**

    This case is an administrative appeal by Davis, who seeks review of a decision by an Administrative Law Judge ("ALJ"), affirmed by the Vice Commandant of the Coast Guard (the "Commandant"), denying Davis attorney's fees and expenses incurred in an adversary adjudication brought by the Coast Guard. The following facts are taken from the parties' Local

1

Rule 56.1 submissions[1] and the underlying Administrative Record ("AR"), and are undisputed unless otherwise noted.

### A. Coast Guard Drug and Alcohol Abuse Program

On September 29, 2011, the Coast Guard issued a new instruction manual entitled "Coast Guard Drug and Alcohol Abuse Program" (the "Manual"). (PSOF ¶ 1; AR0389-450.) The Manual established the new policies and procedures concerning the administration of the Coast Guard's drug and alcohol abuse program, including its urinalysis[2] program. (PSOF ¶ 2; DSOF ¶ 10; AR0427-50.) The Manual was binding on Coast Guard personnel. (PSOF ¶ 3.)

The Manual provides that "[c]ommanding officers shall initiate an investigation into a possible drug incident[3] . . . following receipt of a positive confirmed urinalysis result or any other evidence of drug abuse." (AR0421.) If the evidence of a possible drug incident includes a positive urinalysis result, the Manual states that "the command should also determine whether the urinalysis was conducted in accordance with [the Manual] and whether the collection and chain of

---

[1] "PSOF" refers to Plaintiff's statement of undisputed facts (ECF No. 15-1), with Defendant's responses (ECF No. 16-1 at 1-15). "DSOF" refers to Defendant's statement of undisputed facts (ECF No. 13-1), with Plaintiff's responses (ECF No. 14-1 at 1-25). "PSSOF" refers to Plaintiff's supplemental statement of undisputed facts (ECF No. 14-1 at 26-29), with Defendant's responses (ECF No. 16-1 at 15-19). "PSOAF" refers to Plaintiff's statement of additional facts not in dispute contained in the administrative record (ECF No. 14-1 at 29-34), with Defendant's responses (ECF No. 16-1 at 19-26). "PSOAA" refers to Plaintiff's statement of additional admissions by Coast Guard contained in its motion for summary judgment (ECF No. 14-1 at 34), with Defendant's responses (ECF No. 16-1 at 26-27). "PSUF" refers to Plaintiff's summary of undisputed facts (ECF No. 17-1) to which Defendant did not respond.

[2] The Manual defines "urinalysis" as "[t]he entire procedure involved in obtaining urine samples under controlled conditions, maintaining a chain of custody on each sample, and scientifically analyzing the samples to detect the presence of drugs." (AR0402.)

[3] The Manual states that any of the following conduct constitutes a drug incident as determined by the commanding officer: (a) intentional drug use; (b) wrongful drug possession; (c) drug trafficking; (d) the intentional use of other substances to obtain a "high," contrary to their intended use; or (e) a civil or military conviction for wrongful use, possession, or trafficking of drugs, unless rebutted by other evidence. (AR0402.)

2

custody procedures were properly followed." (AR0423.) If after the completion of an investigation it is determined a drug incident occurred, the Manual requires the commanding officer to take action against the member, which may include processing the member for separation from the Coast Guard by reason of misconduct. (AR0423-24.)

The Manual further provides detailed instructions for conducting random urinalysis testing, including step-by-step collection procedures, which will be summarize here. (*See* AR0427-450.) The collection procedure begins with a member selected for urinalysis testing reporting to the urinalysis coordinator[4] with his/her identification card in hand. (AR0432.) The coordinator initiates the Urinalysis Ledger[5] and will record the member's name, rank, test basis, social security number and enter the document/batch and specimen number. (AR0433.) The coordinator initiates a bottle label, and records the date and the member's social security number on the bottle label. (*Id.*) The member verifies to the coordinator that the information on the ledger and bottle label is correct. (*Id.*) The member signs the ledger and initials the bottle label documenting that his/her name, social security number, batch/document number, rank, and date are correct on the ledger and his social security number and date are correct on the label. (*Id.*) The observer also initials the label. (AR0437.) This process is accomplished prior to the label being affixed to the specimen bottle. (AR0433, AR0437.) The coordinator then removes an empty specimen bottle from a box,

---

[4] The "urinalysis coordinator" is responsible for maintenance and administration of the command urinalysis program, including the training of alternate coordinators and observers and the shipment of uncompromised specimens for analysis. (AR0428.) The Manual provides that "[u]rinalysis coordinators shall supervise all specimen collections and make all urinalysis ledger entries." (*Id.*) An "alternate coordinator" assists in urinalysis procedures and provides additional confirmation that proper procedures are followed. (*Id.*) Urinalysis coordinators are designated in writing by the commanding officer in their command administration list. (*Id.*)

[5] The Manual provides that "[C]ommands shall maintain a urinalysis ledger documenting all urine specimens collected using the Coast Guard Urinalysis Ledger, Form CG-1000." (AR0438.)

3

removes the cap, verifies with the member and observer the bottle is clean, and recaps the bottle in full view of the member and observer. (AR0433.) The coordinator places the member's identification card in the same slot from which the bottle was removed and attaches the label to the specimen bottle in full view of the member and observer. (*Id.*) The coordinator gives the specimen bottle to the member in the presence of the observer. (*Id.*) The member maintains custody of the specimen bottle from the time the coordinator gives him the bottle until it is filled and capped. (*Id.*) The observer ensures he/she has full view of the specimen bottle at all times and escorts the member from the coordinator's table to the collection point, where the member provides at least 30 milliliters of urine and then caps the bottle. (AR0433-34.) The observer then accompanies the member back to the coordinator's table. (AR0434.) The observer signs the urinalysis ledger, certifying the urine specimen bottle contains urine provided by the member and was not contaminated or altered in any way. (*Id.*) The coordinator receives the urine specimen bottle from the member and initials the urine specimen bottle label in the member's presence and transcribes the information to Specimen Custody Document-Drug Testing, DD Form 2624. (AR0434-35.) Tamper-resistant tape is then applied to the urine specimen bottle. (AR0435.)

The coordinator prepares the specimens for shipment and mails them to Tripler Army Medical Center Forensic Toxicology Drug Testing Laboratory ("Tripler Lab") for analysis. (AR0443-45.) Tripler Lab performs an initial screening test of the received specimens, which furnishes a presumptive positive or presumptive negative result that is used to determine whether confirmatory tests are warranted. (AR0445.) Any specimen presumed positive undergoes a confirmatory test using Gas Chromatography-Mass Spectrometry ("GC/MS") technology.[6] (*Id.*)

---

[6] A screening test detects only a class of drugs, whereas the confirmatory testing using GC/MS technology detects a specific metabolite of a certain drug. (AR0445.)

Tripler Lab then reports confirmed positive test results to the originating command. (AR0446.) The Manual provides that "[a] positive finding is evidence of drug use." (*Id.*)

### B. Davis' Urinalysis Test and Results

Davis was an active duty Coast Guard Petty Officer stationed at Coast Guard Station Sandy Hook. (PSOF ¶ 8; DSOF ¶ 11.) On January 11, 2012, Davis was selected for urinalysis testing, along with eleven other Coast Guard members, and gave a urine sample. (PSOF ¶¶ 19, 26; DSOF ¶¶ 14, 16.) The urinalysis testing was overseen by Chief Petty Officer Kori Heath ("YNC Heath"), who was officially designated as an alternate coordinator.[7] (PSOF ¶ 14; DSOF ¶ 15.) It is undisputed that a procedural error occurred in the collection of Davis' specimen and aspects of the collection of Davis' specimen was not conducted in accordance with the Manual. (PSOF ¶ 57-58.) Specifically, YNC Heath wrote Davis' social security number on a label, but did not have Davis or his observer initial the label at that time. (PSOF ¶ 59.) YNC Heath also did not affix the label to Davis' sample bottle before providing the sample bottle to Davis in the presence of his observer. (PSOF ¶¶ 59, 68; DSOF ¶ 66.) Instead, the label with Davis' social security number remained on the table along with all of the labels of other members who submitted to urinalysis drug testing that day, while Davis filled his sample bottle at the collection site. (PSOF ¶¶ 59, 68; DSOF ¶ 66.)

---

[7] YNC Heath was not officially designated as a urinalysis coordinator. (PSOF ¶ 14-15.) There is a dispute of fact concerning whether a urinalysis coordinator was present to supervise the collection of Davis' urine specimen. (*See* PSOF ¶ 18; DSOF ¶ 15.) The Coast Guard maintains that YNC Heath served as the urinalysis coordinator during the collection of Davis' urine specimen, although she did not have the proper written designation, and that YNC Heath was authorized by the Coast Guard command to collect specimens and complete the Urinalysis Ledger. (*See* PSOF ¶¶ 15-18.) This dispute of fact does not affect the Court's analysis.

Upon returning to the coordinator table from the collection site, Davis initialed a label and that label was applied to his sample bottle. (PSOF ¶ 74, 81-82; DSOF ¶¶ 67, 71.)[8] Davis did not review the contents of the label and simply initialed it. (DSOF ¶ 70.)[9] Davis' observer also initialed the label applied to Davis' sample bottle. (PSOF ¶ 77-78; DSOF ¶ 72.) The label Davis and his observer actually initialed, and that was affixed to Davis' sample bottle, was bearing the social security number of another Coast Guard member, WF. (DSOF ¶ 77.) WF and his observer initialed the label that contained Davis' social security number, and affixed the label bearing Davis' social security number to WF's sample bottle. (PSOF ¶ 85-87; DSOF ¶¶ 76, 77-79.) As a result, the sample bottle bearing Davis' social security number did not contain Davis' urine and was not the one he and his observer had initialed. (PSOF ¶ 86; DSOF ¶ 78-79.)

Tripler Lab evaluated the samples and reported one sample tested positive for cocaine metabolites. (PSOF ¶ 33; DSOF ¶ 21.) Tripler Lab reported the sample that tested positive for cocaine metabolites came from the sample bottle labeled with Davis' social security number. (DSOF ¶ 24.) As a result, the Coast Guard concluded the positive sample was provided by Davis. (DSOF ¶ 25.) On January 31, 2012, Davis was informed by his commanding officer that he had tested positive for cocaine metabolites. (PSOF ¶ 34.) Davis vehemently denied that he had ever used cocaine. (PSOF ¶ 35.)

---

[8] The parties' dispute who physically affixed the label to the sample bottle; YNC Heath and Davis each maintain that the other did so. (DSOF ¶ 71.)

[9] Davis did, however, complete a Urinalysis Provider's Check List, certifying that "the Batch Number, Specimen Number, and [his] Social Security Number written on the [the Checklist] match the Sample Container, the Drug Urinalysis Sample Ledger, and the Urine Sample Custody Document." (AR0239.) There is a dispute of fact pertaining to when Davis completed the Check List. (*See* PSOF ¶ 66; DSOF ¶ 17.) However, it is undisputed that before Davis saw the label, he initialed the Check List that was then taken, flipped over, and put in a folder. (PSOF ¶ 67.)

### C. Coast Guard Investigation and Discharge

Based on the result of the positive urinalysis test, the Coast Guard Investigative Service ("CGIS") conducted an investigation.[10] (PSOF ¶ 41; DSOF ¶ 26; *see also* AR0814-52.) The CGIS investigation did not include an interview with YNC Heath to review the procedures employed during the urinalysis test. (PSOF ¶ 45.) Davis, assuming the lab results were accurate, suggested to representatives of the command and CGIS agents that he may have been slipped cocaine when he visited a bar in Neptune, NJ. (DSOF ¶ 27; *see also* AR0829, AR0832, AR0839.) After reviewing the investigation and related evidence, Davis' commanding officer determined that a "drug incident," as defined by the Manual had occurred. (DSOF ¶ 29.) Accordingly, Davis' commanding officer requested that Davis be discharged from the Coast Guard due to misconduct. (DSOF ¶ 31.)

An Administrative Separation ("ADSEP") Board[11] was convened and heard evidence concerning the facts and circumstances of the positive urinalysis test for cocaine. (PSOF ¶ 42; DSOF ¶ 34; *see also* AR0583-96.) The Coast Guard offered no testimony regarding the procedures followed by YNC Heath in collecting Davis' urine sample, and Davis did not argue that the sample was not his. (PSOF ¶ 48; DSOF ¶ 36.) Davis, however, presented evidence in the form of a hair drug test and a polygraph that supported Davis' contention that he had never been a user of cocaine. (PSOF ¶¶ 49-50.) The ADSEP Board rendered findings and determined that a "drug incident" occurred involving Davis. (DSOF ¶ 37.) The ADSEP Board recommended that Davis be given a

---

[10] The role of a CGIS investigation is not to determine if a drug incident actually occurred, but to determine if other members of a Coast Guard unit are involved in the use or supply of other prohibited substances. (PSOF ¶¶ 43-44; *see also* AR0586, AR0596.)

[11] Coast Guard members with more than eight years of service are entitled to an ADSEP Board prior to discharge. (DSOF ¶ 32.) The ADSEP Board is required to make a determination as to whether a "drug incident" occurred. (DSOF ¶ 33.)

7

general discharge for misconduct due to involvement with drugs. (PSOF ¶ 52; DSOF ¶ 37; *see also* AR0260.) That recommendation was approved by the Coast Guard personnel office on December 18, 2012. (PSOF ¶ 52; DSOF ¶ 38; AR0260.)

### D. Suspension and Revocation Proceeding

Separate from his status as an active duty member of the Coast Guard, Davis possessed a merchant mariner credential (a "credential") issued by the Coast Guard. (PSOF ¶ 53; DSOF ¶¶ 39-40.) When the Coast Guard learns that a credential holder has used a dangerous drug, the Coast Guard will initiate an action against that individual's credential. (DSOF ¶ 41.) On February 11, 2013, the Coast Guard filed a Suspension and Revocation ("S&R") complaint against Davis' Merchant Mariner Credential on the basis of the urinalysis evidence. (PSOF ¶¶ 54-55; DSOF ¶ 42.) The Coast Guard's prosecutor did not interview any witnesses before the S&R complaint was filed. (PSOF ¶ 56.)

From February 11, 2013 until May 2, 2013 (the first day of the S&R hearing), the parties litigated pre-hearing issues, including discovery issues. (DSOF ¶ 46.) A discovery issue arose regarding inspection of Davis' sample bottle from the urinalysis. (DSOF ¶ 47.) Davis sought production of the sample bottle; the Coast Guard opposed his request. (DSOF ¶¶ 48-49.) Davis made a motion to compel production of the sample bottle, which was denied by the ALJ. (DSOF ¶ 50.) Davis also attempted to obtain the sample bottle directly from Tripler Lab, however the Coast Guard directed Tripler Lab not to produce the sample bottle in view of the ALJ's denial of Davis' motion to compel. (DSOF ¶¶ 51-52.) On April 23, 2013, Davis filed a second motion to compel production of his sample bottle. (DSOF ¶ 53.) On April 25, 2013, the ALJ granted Davis' motion. (DSOF ¶¶ 55, 57.) The sample bottle was made available for inspection by both parties the day before the hearing began on May 1, 2013. (DSOF ¶ 57.)

Davis obtained access to his sample bottle shortly before the S&R hearing was to commence. (PSSOF ¶ 21.) Upon inspection of the sample bottle, it was discovered the bottle label did not bear the initials of Davis or his observer, and instead appeared to contain the initials matching that of Coast Guard member WF and his observer. (PSSOF ¶¶ 22-23.) The Coast Guard prosecutors were advised of this discrepancy before trial commenced, but proceeded with the two-day S&R hearing. (PSSOF ¶¶ 24-25; DSOF ¶ 62.) The procedural error that occurred in the collection of Davis' specimen and the aspects of the collection of Davis' specimen that were not in accordance with the Manual became clear during the hearing. (*See* PSOF ¶¶ 59-61, 63-65, 67-69, 73-87, 89; DSOF ¶¶ 63, 66-67, 72, 74-79.) At the close of the hearing's second day, after testimony concerning the initials on Davis' sample bottle had been received into the record, the Coast Guard moved for a continuance so that it could conduct further investigation. (DSOF ¶ 80.) On May 24, 2013, the Coast Guard filed a motion for voluntary dismissal. (DSOF ¶ 81.) The ALJ granted the motion and dismissed the S&R complaint with prejudice. (DSOF ¶ 82.)

### E. Post-S&R Hearing Proceedings

Davis filed an application with the Coast Guard Board for Correction of Military Records ("BCMR") seeking reinstatement, back pay, benefits, and other emoluments. (PSOF ¶ 93.) The Coast Guard acknowledged, in its advisory opinion to the BCMR, that a procedural error had occurred in both the collection and identification of Davis' specimen and that Davis' discharge was due to administrative error. (PSOF ¶¶ 95-96.) Davis' application was granted in part and the BCMR corrected Davis' military record. (PSOF ¶¶ 94, 97.)

Davis also filed a timely application for attorney's fees and expenses with the ALJ. (PSOF ¶ 98; DSOF ¶ 83.) The ALJ denied Davis' application, finding that the Coast Guard's position in the S&R proceeding was substantially justified both in fact and in law. (ECF No. 1-11.) The ALJ

found the Coast Guard had a reasonable basis in law because the Coast Guard proceeded on a legal theory that Davis tested positive for cocaine on a Coast Guard random drug test in violation of 46 U.S.C. § 7704. (*Id.* at 10-11.) Further, the ALJ found the Coast Guard had a basis in fact to bring the S&R complaint because the "Coast Guard's documentary evidence showed [Davis] tested positive for cocaine during a Coast Guard drug test." (*Id.* at 11.) The ALJ relied on the fact that Davis' social security number was on the sample bottle and was contained in the documentation from the lab which conducted the testing. (*Id.*) The ALJ noted the Urinalysis Provider's Check List that Davis completed provided a link between Davis and the sample. (*Id.*) The ALJ also cited YNC Heath's testimony at the S&R hearing and the testimony of a seaman that Davis supervised as supportive of the Coast Guard's position. (*Id.* at 12.) The ALJ rejected Davis' arguments that the Coast Guard did not perform an adequate investigation, failed to investigate the positive drug test, and ignored his exonerating evidence in the form of a hair drug test and polygraph test. (*Id.* at 12-14.)

Davis filed a timely notice of appeal with the Commandant of the Coast Guard pursuant to 33 C.F.R. § 20.1001. (PSOF ¶ 101; DSOF ¶ 86.) The Commandant, in affirming the ALJ's denial of an award of attorney's fees and expenses, found the "Coast Guard was substantially justified in commencing S&R proceedings against Applicant's merchant mariner credential." (ECF No. 1-16 at 6.) Specifically, the Commandant concluded that:

> The record shows that a urine sample collected in a container affixed with Applicant's Social Security Number and verified, at the time of collection, by Applicant as containing his own sample, tested positive for the presence of dangerous drugs. (There is no evidence suggesting that the testing of the subject urine sample was conducted improperly, and no issue has been raised regarding testing.) Thus, the Coast Guard's allegation that Applicant was a user of or was addicted to the use of dangerous drugs had a reasonable basis both in law and fact, as determined by the totality of the circumstances.

(*Id.*)  In addition, the Commandant held that Davis' status as an active-duty Coast Guard member did not create any heightened duty to investigate, and the investigation was conducted properly in accordance with 46 C.F.R. Part 5, Subpart D.  (*Id.*)

Davis then invoked 5 U.S.C. § 504(c)(2), asking this Court to review the merits of the denial of an award of attorney's fees and expenses.  Both parties filed motions for summary judgment, seeking a ruling by the Court as to whether there is substantial evidence in the record below to support the finding that the Coast Guard was substantially justified in bringing the S&R proceeding against Davis, thus precluding Davis from obtaining an award of attorney's fees and expenses. (ECF Nos. 13, 15.)

## II.  LEGAL STANDARD

Section 504(a)(1) of the EAJA allows a prevailing party in an adversary adjudication to collect "fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency was substantially justified or that special circumstances make an award unjust."  5 U.S.C. § 504(a)(1).  The parties here do not dispute that Davis was the prevailing party or that the underlying proceeding was an adversary adjudication.  (*See* ECF No. 13 at 8.)  Rather, Davis argues he should have been awarded fees because the Coast Guard's position in the proceeding was not substantially justified.

In an EAJA action, the agency bears the burden of proving its position was substantially justified—that it was "justified to a degree that could satisfy a reasonable person"—and its position must be substantially justified not only at the filing of the charge but throughout the course of the litigation.  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988); *see Morgan v. Perry*, 142 F.3d 670, 684 (1998).  To satisfy this burden and defeat a prevailing party's application for fees, the agency must demonstrate "(1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in

11

law for the theory it propounded; and (3) a reasonable connection between the facts alleged and the legal theory advanced." *Morgan*, 142 F.3d at 684 (citation omitted.) Thus, it is not up to this Court to decide if the Coast Guard was correct in its position, but only to determine whether "a reasonable person could countenance the Coast Guard's position in the particular context of this dispute." *Bruch v. U.S. Coast Guard*, 749 F. Supp. 688, 694 (E.D. Pa. 1990).

The EAJA permits a litigant who is dissatisfied with denial of fees to appeal that decision "to the court of the United States having jurisdiction to review the merits of the underlying decision of the agency adversary adjudication." 28 U.S.C. § 504(c)(2). In hearing the appeal, any determination by this Court must "be based solely on the factual record made before the agency," and the fees or expenses award may be modified "only if the court finds that the failure to make an award of fees or other expenses . . . was unsupported by substantial evidence." *Id*.

The Supreme Court has defined "substantial evidence" in the context of court review of an administrative agency decision as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a mere scintilla," *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951), but is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Consolo*, 383 U.S. at 620.

### III. DECISION

Davis argues the Coast Guard was not substantially justified in bringing an S&R proceeding against him in either law or in fact. The Coast Guard disputes Davis' claims and maintains that this Court should find the record contains substantial evidence upon which the denial of an award was based. For the following reasons and based on the factual record below, the Court finds that the failure to make an award of attorney's fees and other expenses was unsupported by substantial evidence.

#### A. Basis in Law

The Court must determine whether the Coast Guard's theory that it propounded was substantially justified in law. The Coast Guard contends the ALJ correctly decided that it was legally justified in bringing an S&R proceeding based on the results of a drug test administered to Davis under Coast Guard rules and in the context of his status as a Coast Guard member, rather than a drug test administered to him under Department of Transportation rules in the context of his status as a merchant mariner. (ECF No. 13-2 at 11-14.) Davis does not disagree with the Coast Guard's position that it may use this type of evidence to bring an S&R complaint. (*See* ECF No. 15 at 27.) Davis' challenge pertains to the adequacy of the factual evidence to support the Coast Guard's legal theory, not the legal theory itself. Therefore, the Court holds the Coast Guard had a reasonable basis in law for bringing an S&R proceeding against Davis.

#### B. Basis in Fact

Next, this Court must determine whether there was substantial evidence in the record to support a finding that the Coast Guard's position had a reasonable basis in fact.

Davis argues the Coast Guard was not substantially justified at any time in the underlying proceeding because it failed to investigate, as required by the Manual, whether the collection

procedure used to obtain Davis' urine specimen was in accordance with the Manual. (*See* ECF No. 15 at 23-27; AR0423.) The Coast Guard does not dispute that it failed to conduct an investigation into these procedures until after the S&R proceeding was continued. (PSOF ¶¶ 45, 56, 92; DSOF ¶¶ 58, 80.) Davis contends the ADSEP Board unreasonably assumed the collection of Davis' urine specimen was done properly, without conducting any investigation. (ECF No. 15 at 25-26.) According to Davis, this assumption tainted the entire process, diminishing the key evidence the Coast Guard relied on to bring the S&R complaint—making the factual basis supporting its claims unreasonable. (*See id.* at 27.)

Davis also argues that the ALJ's initial decision was not supported by the record. (*See id.* at 27-33.) Davis challenges the finding that there was evidence of a positive drug test to support the Coast Guard's theory due to the lack of an investigation into the collection procedures. (*Id.* at 27-28.) He also disagrees with the ALJ's reliance on the testimony of YNC Heath to conclude that the Coast Guard's factual allegations were justified. (*Id.* at 28-29.) Davis points out that YNC Heath was not interviewed by CGIS prior to the empaneling of the ADSEP Board, or by the S&R prosecutor prior to the filing of the S&R Complaint. (*Id.* at 28.) Therefore, Davis concludes the Coast Guard could not have relied on what it did not yet know when it filed the S&R complaint against him.

Davis also argues that the ALJ's reliance on certain evidence was misplaced. Specifically, he argues the ALJ's reliance on the investigation that was actually conducted by CGIS was flawed because its focus was not whether a drug incident actually occurred. (*Id.* at 30-31; *see also* n. 9, *supra*.) Additionally, he contends that the reliance on the Urinalysis Provider's Check List was also flawed because he initialed it before he saw the label, conflicting with the Manual's procedure. (*Id.* at 32; *see also* n. 8, *supra*.)

The Coast Guard argues its position was substantially justified in fact because the Coast Guard reasonably relied on the evidence of Davis' urinalysis test. (*See* ECF No. 13-2 at 14-19.) The Coast Guard maintains that prior to filing the S&R complaint, it conducted an adequate investigation and that Davis had the opportunity to present evidence and testimony at the ADSEP hearing, which he did. (*See id.* at 15-19.) Based on this activity, the Coast Guard argues that it was substantially justified in filing the S&R complaint. (*Id.*) The Coast Guard also argues the reasonable connection between the facts alleged and the legal theory advanced was severed when, for the first time, evidence and testimony was presented showing that the sample that had tested positive for cocaine metabolites was not Davis' sample. (*Id.* at 19.)

Based on a review of the record below, the Court holds that the failure to make an award of fees or other expenses in this case was unsupported by substantial evidence. The Manual setting forth the collection procedures states that "[i]f the evidence of a possible drug incident includes a positive urinalysis result, the command should also determine whether the urinalysis was conducted in accordance with this Article and whether the collection and chain of custody procedures were properly followed." (AR0423.) It is undisputed that the Coast Guard failed to make this determination prior to the ADSEP proceeding or the filing of the S&R complaint. The Coast Guard did not interview YNC Heath to review the procedures she employed and did not make any effort to inspect Davis' sample bottle.[12] The Manual's provision requiring a review of the collection and chain of custody procedures is certainly a safeguard to quickly and effectively

---

[12] The Court notes that the Coast Guard makes much of when it first saw the sample bottle. (*See, e.g.,* DSOF ¶¶ 58, 61; ECF No. 13-2 at 18-19.) However, there is nothing in the record to suggest that the sample bottle was not accessible to the Coast Guard after it was sent to Tripler Lab for testing. Moreover, at the S&R hearing, the Coast Guard demonstrated the ease in which the label information could be reviewed by sending photographs of the sample bottle label to Davis' observer who testified via telephone. (*See* DSOF ¶¶ 73-74.)

identify breakdowns in the collection procedure, such as what happened here. Moreover, when the integrity of the collection procedure is in doubt, the strength of a positive urinalysis test as evidence of drug use is diminished. *See, e.g., U.S.C.G. v. Westgate*, SR-2001-26 (Nov. 15, 2001); *U.S.C.G. v. Kirk*, SR-1999-03 (Nov. 2, 1999). If the Coast Guard had followed its own procedures and reviewed the initials on Davis' sample bottle following Tripler Labs report of a positive confirmed urinalysis result, it would have been alerted to a significant discrepancy. The Coast Guard's reliance on a positive urinalysis result to initiate proceedings against Davis, without determining whether the collection and chain of custody procedures were properly followed, as required by its own Manual, is unreasonable.

The Coast Guard's reliance on Davis' Urinalysis Provider's Check List to support its claim, without any investigation into the collection procedure or chain of custody, is similarly unreasonable. Davis' Urinalysis Provider's Check List is not a substitute for the Coast Guard's own investigation into the collection procedures and chain of custody. For example, the Coast Guard never investigated at what point in the collection process Davis completed his Check List. Had the Coast Guard done so, it would have received differing accounts from Davis and YNC Heath, which would have required further investigation. (*See* PSOF ¶ 66; DSOF ¶ 17.)

Both the ALJ and Commandant reasoned that the Coast Guard's basis in fact was substantially justified because there was no evidence suggesting that the testing of Davis' urine sample was conducted improperly. This reasoning misses the point. The lack of evidence regarding the collection procedure does not immunize the Coast Guard from failing to conduct an investigation in accordance with its own Manual. Moreover, as the Coast Guard admits in its brief, "the question is whether the agency's position based on what it knew or **reasonably should have known at the time**, was substantially justified." (ECF No. 13-2 (emphasis added).) The Court

16

finds the Coast Guard reasonably should have known that the collection procedures were compromised prior to initiating the two proceedings against Davis.

Likewise, the Court finds the additional evidence relied on by the ALJ and Commandant is inadequate to support the conclusion that the Coast Guard's position was substantially justified in fact. There was no witness testimony establishing drug use by Davis. Davis' statements to the CGIS investigators were not admissions of drug use. Davis vehemently denied that he had ever used cocaine, but believing the drug test result was accurate, speculated as to how he could have involuntarily ingested cocaine. This falls short of substantial evidence. The ability of the Coast Guard to rely on YNC Heath's testimony is also suspect. It is undisputed that YNC Heath was never interviewed prior to the S&R hearing. Therefore, it is impossible for the Coast Guard to have relied on her testimony in deciding to file the S&R complaint.

Because the ALJ and Commandant's finding that the Coast Guard was substantially justified in fact is unsupported by substantial evidence summary judgment in favor of Davis is warranted.

### C. Remand

Defendant contends that we should remand this case to the Coast Guard for a determination as to the amount of reasonable attorney's fees and expenses in the first instance. (*See* ECF No. 13-2 at 24-25; ECF No. 16 at 13-14.) Defendant argues that "[b]ecause the majority of the requested fees represent time incurred in administrative proceedings before an administrative law judge, it is appropriate for that judge to conduct such an evaluation." (*See* ECF No. 16 at 13.) The Court agrees and remands this matter to the Coast Guard for a determination of the amount of reasonable attorney's fees and expenses to be awarded.

**IV.   CONCLUSION**

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (ECF No. 15) is **GRANTED in part** and **REMANDED in part** and Defendant's Motion for Summary Judgment (ECF No. 13) is **DENIED**. Specifically, this Court **GRANTS** summary judgment in favor of Davis as to his entitlement to recover attorney's fees and expenses from the Coast Guard under the EAJA and **REMANDS** to the Coast Guard for a determination of the amount of reasonable attorney's fees and expenses to be awarded. An appropriate Order will follow.

Date: July 26, 2017                                   */s/ Brian R. Martinotti*
                                                                        **HON. BRIAN R. MARTINOTTI**
                                                                        **UNITED STATES DISTRICT JUDGE**